Your honors, may it please the court. My name is Jason Owens. I represent Baxter County Arkansas in this lawsuit. I'm pleased to have Sheriff John Montgomery with us sitting in the gallery today, my client. This case comes to the court on a second appeal. It was previously heard by a panel and partially remanded for some limited supplemental fact-finding despite the fact that a bench trial had already been had in the case at that point. This court sent the case back on a limited remand to engage in further fact-finding on the second prong of the familiar Turner First Amendment test. After that proceeding, ultimately described as an evidentiary hearing and a supplemental bench trial, the district court issued a new order reversing itself on all four prongs of the test and reversing its ultimate conclusion. And then thereafter awarding attorney's fees to the tune of nearly $300,000 attorney's fees and costs. This opinion, respectfully, contradicts the opinions of this court in Simpson v. Cape Girardeau and of this court and the lower court, which is the same court this case arises from, the Western District of Arkansas, in the Human Rights Defense Center v. Union County, as well as the district court case in that same district, Rasheed v. Texarkana. All three in which substantively identical postcard mail policies were affirmed as constitutional. At this point, the only place where this mail policy is unconstitutional in the Eighth Circuit is Mountain Home, Arkansas. Counsel, I don't disagree that there are divergent outcomes, but we also have different factual findings. And the district court, on page 16 of its order, found that the county's 2017 policy and practices de facto barred HRDC's publications in the jail. Wouldn't we have to find that that was a clearly erroneous finding? No, Your Honor, because I think that's a legal finding, ultimately. The factual findings were that alternative means were allowed, that there were other methods for communication, which were found to be sufficient in Simpson v. Cape Girardeau, found by the jury to be sufficient in Human Rights Defense Center v. Union County, and the court in Rasheed v. Texarkana. What are those? Well, here, there are multiple avenues. One is telephone calls. Another is visitation. A third is... Those aren't very effective ways for a publisher to communicate, are they? Well, of course they are. Now, is it the preferred format for this organization? The word publisher has been thrown around a lot here because it was mentioned in Bell v. Wolfish, right? And in that case, there was a line from an affidavit of one of the witnesses that said that, in his view, this particular witness, mail from publishers was less risky. Well, that case was decided in 1979. I can't think of a job description that's changed more in the last 50 years than publisher. Is that in dispute here, though, in terms of what was at issue factually before the district court? Whether they're a publisher? Is that the question? Yeah, sort of the definition of publisher, or whether that made it in any way unclear what a publisher did or didn't do. Absolutely, because in its first order, the district court said that having a rule that accepts publishers, which it thereafter, in the second order, said was the right thing to do. But it said, in the first order, that that rule would create multiple administrative headaches, including trying to figure out who was and was not a publisher. Here, the assertion's been made, but the testimony of the first trial, for instance, was that this organization outsources all their printing, binding, etc. They sell books published by other entities, mostly. Well, I guess back to Judge Grunder's question, does that really address his question in terms of, here, on this record, would telephone calls and visitations really be a viable alternative means for a publisher? Just to follow up on that, I mean, I can see where that would be a viable alternative means for the mother in Simpson, but not so much for a publisher. Well, viable is, of course, not the word used by the Supreme Court. In fact, the Supreme Court goes to great pains to say it's not a question of whether the available alternatives are ideal, but whether they are available. Is that practically available to a publisher? How would that work? I mean, we know in Simpson how that kind of plays out, mother contacting son, letters, visitations, telephone calls. But as a practical matter, can you describe to me how this would work for the publisher to use the telephone and visitation? You yourself have said this has been litigated in multiple different jails just in Arkansas. The answer is that all of those things are limiting to some degree. Any form of communication is limiting to some degree. Every inmate's mother wishes they could go serve the time with them and wishes they could spend more time with their child. Visitation is always too short. Telephone calls are always too short. The collect calls are too expensive. Those things were brought up in the Pell v. Procunier case and said that's the difference between available and ideal. Those are not ideal for parents either. Do you have anything better, like access to the Internet or accepting donations to the library, that kind of thing? On page 1265 of the appendix, the plaintiff aptly submitted an affidavit by their own employee, a paralegal named Kathy Moses, who also turned out to be a witness in the case because she submitted this affidavit, and on the back end was given a fee as part of the fee award. I've never before encountered a witness being given a fee in a fee position. She said that immediately after receipt of the first batch of return-to-sender mailings, she called at the direction of her superiors, called the jail administrator at that time, and he said, quote, we would appreciate any law books donated to the jail. Before they ever filed this lawsuit, they knew that the jail would accept these books. They never attempted, that's undisputed testimony as well, the sheriff said they never attempted to donate any books or any materials. Did the district court make a factual finding on that question? It's muddy. The district court said in its first opinion that they could donate. In the second opinion, it says that it appears they couldn't donate, but at the same time, the district court admitted the evidence that this was an admission by a party opponent. He admitted the evidence as an admission by a party opponent as an exception to the hearsay rule. That exact quote. That they had not tried to make a donation. Absolutely. That was not in dispute. One of the things that we look for to determine whether a policy is reasonable rather than an excessive response is whether there are obvious, easy alternatives. Why aren't the alternative means of communication in Union County obvious and easy alternatives? In that case, they had kiosks and tablets. For one, it's a much smaller jail with much fewer resources. This jail has a million dollar annual budget. That's the entire budget for the jail. They don't have kiosks. They don't have those things, which are expensive, particularly on the front end for a jail like this. Certainly, the First Amendment doesn't dictate electronic communication. One of the problems with this case is that ultimately what they're saying is not that we can't communicate, but that we can't communicate in the format we prefer. What of the next plaintiff that asserts, I want to communicate digitally, so you have to create an email address for everyone? Or, I'm a motivational speaker. I want to come right in the middle of your jail and give a speech. Wouldn't each one of those be subject to the same analysis, a very fact-intensive analysis, as to what other alternatives? Because you've really described different types of speakers, different types of people or organizations wanting to communicate, which would then trigger different alternatives that, as a practical matter, would be available. Well, not on the facts here because, again, HRDC sued both Baxter strategically. They conceded at this point at the first bench trial, the first iteration of the bench trial, that they strategically targeted Baxter and Union County because they had something on their website about these policies and they wanted to file a lawsuit. Sixty percent of their mission, they said, under oath, was litigation. This is what they do. They pursue these kinds of cases, frankly, in the hopes of attorney's fees. So, no, there's not a principle distinction between this case and the Union County case. It was a substantively identical policy. Do they now have something different? Yes. My understanding is that Union County now has something different. This complaint was not supplemented. This complaint deals with what things were in 2017 when these cases were first filed. And the policies were substantively identical. If you compare the complaints filed by the plaintiff in both cases, they're nearly identical except for the names of the counties. They assert the same bad action, namely the First Amendment violation, through the substantively identical policy. The court, in its earlier opinion, sent this back to the district court on the question of whether this created a de facto permanent ban under Overton and Beard, both disciplinary cases from a prison setting, which is obviously very different from a county jail. Those cases presented significantly more severe restrictions on communication across the board than anything that's been documented at the trials in this case. And yet, both of those were determined, held by the U.S. Supreme Court, to not constitute de facto permanent bans. Because while they could last for the rest of a person's life, they didn't in every case. One of the cases said that only 25% of the people ever got out of that situation. In other words, the rest of them, for the rest of their incarceration, many of those life sentences, they would be subject to near universal cutoff of all communications. Those were determined by the U.S. Supreme Court not to be de facto permanent bans. And if you go on in the language of those cases, it's de facto permanent bans of all communications with the outside world. That's what they say. That's not remotely at issue here. They have alternatives. They have the ability to talk in the normal ways. They have the ability. Pell even said that it was an available means of communication to tell somebody else to pass a message along for you that was able to visit them. If you take for purposes of this question that there are no alternatives at the Baxter County Jail for this kind of communication, then Overton or Beard don't really support your argument. Is that correct? So you're saying that in Overton and Beard you could go on forever without communication of any kind, and that was upheld. But the district court said there was no alternative to this kind of communication. If that is true, then what else do Overton and Beard help us with? Or if anything. Well, maybe nothing. I think the fact that the first panel brought up Overton and Beard indicates that there was some thought that there were available alternative means, but that somehow those created a de facto permanent ban. That's not remotely true. In fact, that's never even been brought up in a county jail context by the U.S. Supreme Court or this court. Of course, inmates are held for significantly shorter periods of time in county jail. The average is just a few weeks. So it's hard to even imagine what a permanent ban would mean in that context. Did I see something in the record that suggested that their publications are in the law library now? Yes. So after the panel sent the case back down, the sheriff, in recognition of that concern, put everything that we received in discovery and that was filed with the courts in the law library. Now that was just a few of their magazines with legal articles in it, but that's all that we had of theirs. They had not donated and wouldn't donate anymore. And so he put that in the law library. It was actually available to them. And, again, they haven't made any attempts at donation beyond that. I see I'm getting into my rebuttal time, so if there's no further questions, I'll... Very well. Thank you. Mr. Snyder. Good morning, Your Honors. My name is Theodore Snyder. I'm with the law firm of Davis Wright Shemane. I'm representing the appellee. We'll call them HRDC for purposes of the appeal. Let me start by correcting a few things that were, I believe, misstated by my adversary. First of all, the court did not... This court, in its earlier opinion, did not make a, quote, limited remand. It vacated the prior opinion in its entirety. And, importantly, at footnote five, it said, in connection with the reviewing the alternative means, that it should be considered with the other three Turner factors to determine the reasonableness of the county's policy. The Turner factors should be considered as part of the overall weighting of the relevant interests as opposed to a piecemeal fashion. So, to the extent my adversary is suggesting the district court went beyond its mandate, I believe that that's not accurate. Counsel, I do have one question. Are we dealing here with the policy as it existed in 2017, or is this some sort of moving target? There is a bit of the moving target factor, but the district court addressed the 2017 situation and addressed the situation in 2022 when it had another trial on these issues. I think one of the things that was misstated was the fact that there are somehow... These publications are now available in the law library. The law library, as is clear from the record, is a milk crate with six worn rule books. During the depositions in this case, the sheriff added a couple of the publications. They became from HRDC. They became dated. This could be... So they have not been updated. Has there been any attempt to donate additional materials? The record that the district court... The finding that the district court made is that there is no policy in the district court, in the jail, for the county to accept donations. The county has no record of accepting donations. The factual Friday that has not been challenged is clearly erroneous. It says there is no policy of accepting donations. There is no practical way. There is a long list of reasons why there is no practical way. Is there a policy that prohibits donations? There doesn't seem to be a policy permitting it. If there is no policy, couldn't a practice be good enough? Well, there is no practice. There's no policy. There's no practice. As I understand it, it's in the record now that they're in whatever the law of the library is. There's two additional HRDC publications. And I think the dissent argued, and obviously that's the dissent, but that there was never an attempt to do that and that there may be alternative means available. I don't believe the alternative means. I think this needs to be informed, as I think the panel has recognized, by a view of the entire facts and circumstances. In addition to the so-called law library, the Mill Crate Law Library, there are books available in the more recent time period, book carts, that allow only what the sheriff determines to be, quote, uplifting fiction. It's pretty clear that the county is not receptive to having HRDC submit its publications for review, for availability to the prisoners, the inmates. They have rejected the idea that the prison, the record below is clear that the prison legal news, the publication by HRDC, has been not permitted to be included as, quote, uplifting fiction. Is the uplifting fiction book cart a post-2017 development? Yes. The book carts were not available. They had been shut down for a time period. They were not available in the early period. They were available at the time of the 22 trial. The record found that, as I said, the prison legal news would not be included because it was not what the sheriff determined arbitrarily was not uplifting fiction. Between the 2017 and then the 2022, the law library mill crate, other than the addition of your client's publication, were there any other additions that the record shows were included in that crate? I believe the record shows that they were sort of the old worn copies of the rules. Which were there in 2017. Right. They were replaced with newer versions. But no, like, general access to publications. So I think my adversary would have you believe, wants you to rely on the Simpson case, the Union case, which are readily distinguishable. This case, I mean, I think they would like you to believe that a postcard only policy is constitutionally permissible. Like a per se rule. And I would like to say it's impermissible, but that's not the law. The law is, under Simpson, the law is every case, and this case is a great example because this court sent this back down. Every case is a fact intensive, narrow inquiry. And the Simpson case, as the colloquy before pointed out, showed that the mother in that case had available alternatives. She was able to speak to her child in visits. She was able to make phone calls. She had an ability to exercise her First Amendment right. In the Union case, the county jail made available electronic kiosks, tablets. Those are not available here. So each case has to be looked at its own facts. And the facts in this case are actually quite startling and make clear that really there's a hugely arbitrary nature to the county's policies. So one of the things that the county did was, or the testimony was such that the sheriff would basically decide on a whim what could be included in the book cards. The colloquy that's set forth in the district court's opinion shows that the sheriff could decide one day to include something else, and he could wake up one day to ban that and include something else. This is truly the definition of arbitrariness. The key and what distinguishes this case from the others in probably every case, I mean, the court found basically that, I'm going to read from the district court's decision. He said, the court has yet to identify a single decision upholding a blanket ban on publications applied indiscriminately to all inmates in perpetuity and without allowing access to publications in any format. This was a total permanent ban. The law library included only at the last minute outdated versions of the publication. The book cards were not available. There were no kiosks. You can't practically put a publication on postcards. There'd be hundreds if not thousands of postcards. You can't call up an inmate and read your publication to them. This was, in effect, a total and complete ban, exactly what this court was concerned with and distinguishing this case from the other cases. I think my adversary misstates the Supreme Court decisions. The Beard case and the Overton case were not permanent bans. The Beard case, the policy applied to the, quote, worst of the worst, 0.01% of the prisoners in that case. So it was, as the standard in Turner requires, logically connected to the penological interests and rationally connected. Here, there is no rational connection. This is what Beard warned against, an exaggerated response. There was no real discussion of the actual penological interests here. The idea that contraband could be sent through publications, that was one of the justifications offered. There is no logical, rational basis to think a third-party, distant, neutral publisher is going to be sending contraband through its mailings. So the Bell v. Wolfish, they can say it's an affidavit, but it's just common sense. We really know that there's much more of a risk with family members or friends sending contraband than there would be with a neutral third-party publisher. The idea that there was some cost savings, that also is not logical and rational. The testimony below was, I think the sheriff testified that he'd rather look at one publication than 100 postcards. That's more efficient. So it doesn't make sense that this was somehow a cost savings. I'm not sure I'd buy that. Your comparison of the 100 postcards to the publication isn't the proper one. It's just postcards versus then I've got to flip through every publication to make sure there's not something between the pages and that kind of thing. It seems to me that does increase the cost. If they have to put an officer there to do that. Yeah, I think there's going to be an officer there looking either way. A postcard is not going to contain anything, right? I mean, I agree. I guess my view, Your Honor, would be de minimis. Either way, you're just looking at a publication. You're flipping through, and the likelihood that anything's coming from a neutral party like that seems… Let me ask you this. The initial opinion by the district court found all three factors against you, if I recall right. The opinion, at least as I read it, our opinion, sort of focused on the second factor. And then the opinion we get back is a complete reversal on all three factors. How does additional findings on the second factor affect one and three? So I think I open with this idea that you have to look holistically at this. So, for sure, the district court took a closer look and realized, based on this panel or this court's opinion, that it really needed to look at whether there was a total de facto ban. And it found that. That finding, that there was a de facto total ban, implicates the first Turner factor very clearly, which is whether there's a rational connection between the policy and the legitimate penological objectives. And I think the district court kind of stopped there. And that said, once I found that, I really don't need to go any further. So I think the court saw that, given the fact that there's a ban, and given the fact that this isn't really connected to the legitimate penological objectives, that this doesn't satisfy the first Turner factor. And so, in this case, the fact-intensive inquiry was one that the court found just didn't pass constitutional muster. It was an exaggerated response to the concerns. Counsel, what if we disagree with the district court on the first Turner factor, as to whether the policy has a valid, rational connection to a legitimate government interest? How does that affect the ultimate outcome? Well, I hope you do not. But I realize that it's a hypothetical. So I think it can't affect, it shouldn't affect the outcome, let's put it that way, because, as I said, there's no case, there's no history of any case where a total ban is upheld. There's no way for HRDC to exercise its right to communicate with these, no practical way to exercise its right to communicate with these prisoners. And so, that takes this case, distinguishes it from every single one. I don't need to repeat myself, but nothing in the library was permitted except, one, a couple of outdated reports. No kiosks, nothing in the book cart that the sheriff could change on a whim. HRDC was totally stymied in its ability to communicate with these individuals. So, whatever you're finding on the first factor, I'd say the lack of alternative means, the lack of ability to communicate should be dispositive here. I think a publisher's only type policy was something that the county could have established. There was also, one of the Turner factors is there was no ability to, there was no concern that somehow this is going to involve, like, require massive influx of materials. There was no, HRDC was the only entity that was sending in materials. What if the record had shown that there were other entities wanting to take advantage of this publisher's only policy? Would that change the balancing of all of these factors and figuring out whether this is a constitutional policy? It's a good question, and it's why I think this is a fact-intensive inquiry. There is no record of that, and it was a what-if question. So, I think it depends on the facts and circumstances. Possibly, it would be something to weigh, but there is nothing in that. I think every entity, publisher or not, has a First Amendment right to try to communicate. So, I think it would, unless there was some evidence of a massive influx, I think it should be weighed as something that's in favor of finding the policy unconstitutional. I know my time is running out, so I would like to just address, I know we have a second appeal here, the attorney's fees. I think it wasn't addressed much by my adversary, but these cases are not brought by my client just for attorney's fees. This was a seven-year battle to try to protect First Amendment rights, which is what they do. To suggest that this was somehow a seven-year battle that was somehow waged to earn attorney's fees is not correct. But the key factor is the law. Section 1988 permits and actually mandates the award of a fees in these types of cases. The review is for abuse of discretion. The district court, my client had its fee application cut significantly, both rates and hours, and didn't challenge that because the court's policies are to afford a very generous abuse of discretion standard to the district court. I think the award of fees should be upheld. There's no basis for overturning it, and it should be part of this court's ruling in this case. Can I follow up briefly on Judge Kelly's question? Shouldn't we at least consider the possibility that a ruling in your favor opens up Pandora's box for thousands and thousands of publishers to inundate the jail with similar requests? I think the panel should follow the record in this case, which is that that's not something that appears to have any likelihood. The district court found that HRDC was the only entity sending these things, these publications. They're expensive. So if that were to happen and we come back on a different record, are we going to reverse that? I don't think so. I just think it's very speculative and very unlikely, and nothing in the record suggests it. And sort of common sense indicates that these are expensive to be a publisher and just to prepare and mail these publications to various prisons, and not many folks have the resources or the inclination to do that. These are worthy publications that provide knowledge about updated rulings, news for prisoners on conditions and things like that. There's a limited number of entities and folks that will sort of be in the market for doing this. The panel has no further questions. I respectfully thank you and ask that you affirm the district court's opinion. Thank you. Thank you, Mr. Snyder. I'll speak to a couple points real quickly. First of all, it was a partial remand because there was a due process claim that was affirmed and not remanded at all. With respect to the first and most important problem of the test, this court held in Simpson, quote, there is a common sense connection between the goal of reducing contraband in jail and Kate Girardo's postcard-only incoming mail policy, which is substantively identical to the one in Baxter County. This court also said, quote, there is also a common sense connection between a postcard-only policy and promoting efficiency, end quote. Our position is that those holdings were binding on the district court and should have been the order of the district court, at least as to that prong, and I do think that's the overwhelming inquiry here because that's what the Supreme Court has said. In fact, it's what the district judge says. He called it the sine qua non of this case. He held that way. The district court held that way the first time. It offers very little in the way of why that ruling was changed other than to speak to the difference between publishers and parents of inmates, which it said was irrelevant the first go-around, saying that it would require the court to find that unsolicited commercial junk mail, if I may be so bold, doesn't have the same First Amendment protections as a call from an inmate's mother. That's Supreme Court law. That's black-letter law, and it should be the order of the court on the first prong, which, again, is the most important. I'll speak real quickly to attorney's fees. There were several problems with the attorney fee award, even if the prevailing party status were to stay the same. Of course, we would ask that that be reversed as well, but the first was that while the court and now HRDC says that there was a substantive victory here for the plaintiff, neither the court nor HRDC did the analysis of whether that victory was pyrrhic or not, technical or not. All that's happened here is that the court has allowed them to submit their communications in a different format than they could have otherwise. And really, because there are donations, and I'll speak to that real quickly, but because donations are permitted, it allows them to submit multiple copies. And the answer is, since this order has come down, the jail has been besieged with publications from publishers. That's just happened. And there's no way on the front end to say what the likelihood would be. Our whole rule of law... Is that in the record? No, it's not. It's occurred after the order of the court, of course. The problem with the record on that point is that the court makes a factual finding about a future likelihood based on something that was restricted beforehand. Our entire rule of law rests on the notion that we pass laws and restrictions to lower the frequency of misconduct, not to eliminate it altogether. All laws are broken at some point or another. So not only did the court and HRDC not analyze whether the victory was Pyrrhic or not, we would posit that the court erred in reversing itself on whether to give fees to HRDC's employed counsel and even a witness in the case, which seems ethically fraught, as does sharing legal fees with non-lawyers, which is what's occurring here. The court, in its first opinion on attorney's fees, said that it amounted to an indirect damages award to a party that didn't prove damages. And that's, of course, exactly correct. The plaintiff didn't prove compensatory or punitive damages in either iteration. And the court properly, on the first go-around, denied those fees, which it described in the second go-around as astonishing, unreasonable, and suspect. Thank you, Your Honor. Thank you, Mr. Owen. The court appreciates your briefing of both counsel and your arguments in appearance today. Cases submitted will issue an opinion in due course. You may be dismissed.